**Affirmed and Opinion filed September 25, 2014.**



In The

# Fourteenth Court of Appeals

## NO. 14-13-00444-CV

## DRESSER-RAND GROUP, INC. AND DRESSER-RAND HOLDINGS SPAIN, S.L.U., Appellants

## V.

## CENTAURO CAPITAL, S.L.U. AND JOSEBA GRAJALES, Appellees

**On Appeal from the 151st District Court**
**Harris County, Texas**
**Trial Court Cause No. 2013-14414**

# O P I N I O N

This is an appeal by the plaintiffs from the trial court's order granting the special appearances of a Spanish citizen and a Spanish company. The main issue is whether the trial court erred in concluding that it could not exercise personal jurisdiction over these defendants based upon specific jurisdiction. Concluding that the trial court did not err, we affirm.

# I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff/appellant Dresser-Rand Group, Inc. (hereinafter "Dresser-Rand") is a Delaware corporation with a principal office in Houston, Texas. Plaintiff/appellant Dresser-Rand Holdings Spain, S.L.U. (hereinafter "Dresser-Rand Spain") is a Spanish company that is a wholly owned subsidiary of Dresser-Rand. Dresser-Rand and Dresser-Rand Spain (hereinafter collectively the "Dresser-Rand Parties") filed suit in the trial court below against defendants/appellees Centauro Capital, S.L.U. and Joseba Grajales (hereinafter collectively the "Centauro Parties"). The trial court granted the Centauro Parties' special appearances and dismissed the Dresser-Rand Parties' claims for lack of personal jurisdiction. The trial court issued findings of fact and conclusions of law. On appeal, the Dresser-Rand Parties have challenged some of the trial court's findings of fact, but not the ones recited in the following subsection. *See Eller Media Co. v. City of Houston*, 101 S.W.3d 668, 673–74, 684 (Tex. App.—Houston [1st Dist.] 2003, pet. denied) (stating that the trial court's findings of fact are binding upon the appellate court unless challenged on appeal); *Linton v. Airbus Industrie*, 934 S.W.2d 754, 757 (Tex. App.—Houston [14th Dist.] 1996, writ denied) (same as *Eller Media Co.*).

## Unchallenged Findings of Fact

Centauro Capital is a holding company organized under the laws of Spain. All of Centauro's business is conducted from its offices in Vitoria-Gasteiz, Spain. Centauro Capital has no place of business, office, real estate, or facility of any kind in Texas. Nor does Centauro Capital have employees, servants, or agents in Texas. The company does not maintain an internet website or otherwise advertise in Texas. It has never paid taxes or owned any bank accounts in Texas. Nor has Centauro Capital ever filed a lawsuit in Texas, and before the case under review, it

2

had never been sued in Texas. Centauro Capital does not recruit Texas residents for employment in Texas or outside of Texas.

Joseba Grajales, a citizen of Spain, is the sole director and shareholder of Centauro Capital. Grajales does not now own, nor at any time has he owned, any real estate, property, office, or business in Texas. In his individual capacity, Grajales has never negotiated any contracts with Texas residents or recruited Texas residents for employment. He has never had, and does not now have, any employees, servants, or agents in Texas; he has never paid taxes or owned any bank accounts in Texas. He has never filed a lawsuit in Texas, and until the case under review, Grajales had never been sued in Texas.

Before the 2011 share-purchase transaction involving the Dresser-Rand Parties, Centauro Capital owned approximately sixty-four percent of the shares of Grupo Guascor, S.L., a Spanish company (hereinafter "Grupo Guascor"). Before that transaction, Grajales was the chairman of the board and president of Grupo Guascor. Eleven Spanish investment companies held the remaining approximately thirty-six percent of Grupo Guascor's shares. Grupo Guascor was headquartered in Vitoria-Gasteiz, Spain. When Grajales served as an officer and director of Grupo Guascor, that company did not (1) have any customers in Texas, (2) own any real estate, property, office, or business in Texas, (3) engage in any contracts with Texas residents, (4) recruit Texas residents for employment, (5) have any employees, servants, or agents in Texas, (6) pay taxes in Texas, (7) own any bank accounts in Texas, or (8) file or defend any lawsuit in Texas.

Dresser-Rand approached the Centauro Parties to express its interest in purchasing Grupo Guascor. Dresser-Rand representatives traveled to Spain to express the company's interest to the Centauro Parties and then invited them to Texas for two later meetings if there was interest in a purchase and sale

3

transaction. In April and July of 2010, Grajales traveled to Houston to meet with representatives of Dresser-Rand regarding the potential purchase of Grupo Guascor. All other negotiations, due diligence, conversations, and communications took place while Grajales was either in Spain or France.

The following year, on March 3, 2011, Centauro Capital, the eleven other Grupo Guascor shareholders, Dresser-Rand, and Grupo Guascor entered into a Share Purchase Agreement (hereinafter the "Agreement"). The in-depth due diligence for the Agreement, conducted in Spain and other European locations over a two-week period, and much of the negotiations, including the final negotiations and the execution of the Agreement, occurred in Spain and France. The Agreement provided for a stock and cash transaction in which Dresser-Rand agreed to pay Centauro Capital and the other eleven Grupo Guascor shareholders (hereinafter collectively the "Sellers") €204,868,000 in cash and €170,625,000 in Dresser-Rand shares to acquire all shares of Grupo Guascor.

The Agreement required Dresser-Rand to transmit these payments and shares to the Sellers' accounts, each of which was located in Spain. Centauro Capital's Dresser-Rand shares are held by Merrill Lynch. Centauro Capital communicates exclusively with personnel located in Merrill Lynch's Madrid offices regarding Centauro Capital's Dresser-Rand shares. Centauro Capital has never held or traded the Dresser-Rand shares or any other property through a United States bank or other entity. The Agreement provided that the Sellers would deposit €30,000,000 of the cash consideration to be held in escrow by Banco Bilbao Vizcaya Argentaria, S.A. "or another Spanish institution" for use as a source of money to cover up to €30,000,000 in potential post-closing liabilities from the Sellers to the buyer. The escrow amount was deposited with BNP Paribas Securities Services Surcursal en Espana, located in Madrid, Spain. The closing of

4

the transaction, at which the Sellers transferred their shares of Grupo Guascor to Dresser-Rand, occurred solely in Spain and in accordance with Spanish law.

In accordance with the Agreement, the Dresser-Rand board of directors appointed Grajales to serve as an Advisory Director to Dresser-Rand. As an Advisory Director, Grajales had the right to attend Dresser-Rand board meetings, but he did not have a vote. Grajales attended Dresser-Rand's Board of Directors and General Shareholder Meetings in May 2011 and May 2012, in Houston.

## Post-Closing Adjustment

The closing of the transaction occurred on May 4, 2011. Before the closing, Dresser-Rand entered into an assignment agreement with its subsidiary Dresser-Rand Spain. Section 2.6 of the Agreement sets forth procedures and formulas for calculating and effectuating a post-closing adjustment to the consideration paid by Dresser-Rand for the Grupo Guascor shares (hereinafter the "Adjustment"). Section 2.6(h) provides that under certain circumstances, Grajales, acting as the Seller Representative, "will cause to be paid to [Dresser-Rand]" an amount in cash determined pursuant to section 2.6 as an adjustment to the consideration to be paid by Dresser-Rand.[1] Likewise, section 2.6(h) provides that under other specified circumstances Dresser-Rand will pay to the Sellers an amount in cash determined pursuant to section 2.6 as an adjustment to this consideration. In section 2.6(j), the parties state that "[t]he purpose of this Section 2.6 is to determine the final

---

[1] By their execution of the Agreement, each of the Sellers designated and appointed Grajales as its agent and attorney-in-fact with full power and authority to act for and on its behalf to give and receive notices and communications, to authorize and agree to any adjustments pursuant to section 2.6 and other applicable provisions, to agree to, negotiate, enter into settlements and compromises of, and comply with judgments of courts or other governmental authorities and awards of arbitrators, with respect to, any claims by any of the Dresser-Rand Parties against any of the Sellers or by any of the Sellers against any of the Dresser-Rand Parties, or any other dispute between any of the Dresser-Rand Parties and any of the Sellers.

5

Purchase Price to be paid by [Dresser-Rand] under this Agreement" and that "[a]ny payment made pursuant to this Section 2.6 will be treated by the parties for all purposes as an adjustment to the Closing Consideration."    Section 2.6 prescribes procedures for first determining whether there is a dispute between Dresser-Rand and the Sellers as to the calculation of the amount of the Adjustment.  If there is such a dispute, section 2.6 prescribes three procedures for resolving the dispute.  If these procedures do not result in the resolution of the dispute, then section 2.6(f) provides that the parties will submit the dispute to an expert to be appointed by "the President of the Commercial Court of Paris deciding in summary proceedings." The parties agree that this expert shall act under the terms of Article 1592 of the French Civil Code.  Applying Spanish Generally Accepted Accounting Principles, this expert shall issue a decision only as to the disputed items needed to calculate the amount of the Adjustment.  The decision of this expert is final and binding on the parties for purposes of the section 2.6(h).

### Arbitration Provision

The parties agreed that the Agreement shall be governed by, and construed in accordance with the laws of France, without regard to conflict-of-laws principles, except to the extent the corporate law of Delaware or Spain mandatorily applies.  In the Agreement the parties provided for arbitration of disputes arising out of or in relation to the Agreement that cannot be amicably resolved by reasonable efforts under informal dispute resolution procedures agreed to by the parties.  Any such arbitration must take place in Paris, France, under the Rules of Arbitration of the International Chamber of Commerce (hereinafter "ICC").

### Appointment of Independent Expert

A dispute arose between the Dresser-Rand Parties and the Sellers as to the calculation of the amount of the Adjustment under section 2.6.  In July 2012,

Dresser-Rand Spain applied to the President of the Commercial Court of Paris for appointment of an independent expert to resolve this dispute and in October 2012, one was appointed (hereinafter the "Independent Expert"). When the trial court issued its findings of fact and conclusions of law, the proceeding before the Independent Expert was ongoing and had not been concluded. To date, no party has notified this court that this proceeding has concluded.

## Arbitration Proceeding

Centauro Capital initiated an arbitration proceeding in Paris, France against the Dresser-Rand Parties under the Agreement's arbitration provision. When the trial court issued its findings of fact and conclusions of law, this arbitration proceeding was ongoing and had not been concluded. To date, no party has notified this court that this arbitration proceeding is completed.

## Suit for Injunctive Relief in Texas Court

The Dresser-Rand Parties filed suit in the trial court against the Centauro Parties, seeking injunctive relief barring the Centauro Parties from selling Dresser-Rand stock totaling a value of €25,068,236.14, or if Centauro or Grajales already has sold or desires to sell such stock in the future, requiring the Centauro Parties to place the proceeds of any such sale into escrow until final decisions are rendered in the pending arbitration proceeding and the proceeding before the Independent Expert.

The trial court issued a temporary restraining order. The Centauro Parties then filed special appearances. The trial court dissolved its temporary restraining order and then granted the Centauro Parties' special appearances, dismissing the Dresser-Rand Parties' claims against them for lack of personal jurisdiction. The Dresser-Rand Parties now challenge this ruling.

## II. STANDARD OF REVIEW

Whether the Centauro Parties are subject to personal jurisdiction in Texas is a question of law subject to de novo review. *See BMC Software Belgium, N.V. v. Marchand,* 83 S.W.3d 789, 794 (Tex. 2002). Parties may challenge the legal and factual sufficiency of the trial court's findings of fact, and the Dresser-Rand Parties have challenged the legal and factual sufficiency of the evidence supporting some of the trial court's fact findings.

## III. ISSUES AND ANALYSIS

In eight appellate issues, the Dresser-Rand Parties challenge the trial court's conclusion that it could not exercise personal jurisdiction over the Centauro Parties based upon specific jurisdiction and that the exercise of personal jurisdiction over the Centauro Parties would not comport with traditional notions of fair play and substantial justice. The Dresser-Rand Parties further assert that the Centauro Parties come within the reach of the Texas long-arm statute and that the evidence is legally and factually insufficient to support some of the trial court's fact findings.

### Legal Standards Regarding the Exercise of Personal Jurisdiction

The Texas long-arm statute governs a Texas court's exercise of jurisdiction over nonresident defendants. Tex. Civ. Prac. & Rem. Code Ann. §§17.041–.045 (West 2014). It allows a court to exercise personal jurisdiction as far as the federal constitutional requirements of due process will permit. *See BMC Software*, 83 S.W.3d at 795. The plaintiff bears the initial burden of pleading allegations sufficient to confer jurisdiction under the Texas long-arm statute. *See Moncrief Oil Int'l, Inc. v. OAO Gazprom*, 414 S.W.3d 142, 149 (Tex. 2013). The long-arm statute allows the exercise of personal jurisdiction over a nonresident defendant

8

who "contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state." Tex. Civ. Prac. & Rem. Code § 17.042(1) (West 2014). The Dresser-Rand Parties satisfied their initial burden by alleging that the Centauro Parties were doing business in Texas within the meaning of section 17.042(1) of the Texas Civil Practice and Remedies Code. *See id.*; *Moncrief Oil Int'l, Inc.*, 414 S.W.3d at 149. Because the Dresser-Rand Parties met this initial burden, the burden shifted to the Centauro Parties to negate all potential bases for personal jurisdiction alleged by the Dresser-Rand Parties.[2] *See Moncrief Oil Int'l, Inc.*, 414 S.W.3d at 149.

Personal jurisdiction over a nonresident defendant is constitutional when two conditions are met: (1) the defendant has established minimum contacts with the forum state and (2) the exercise of personal jurisdiction comports with traditional notions of fair play and substantial justice. *See BMC Software*, 83 S.W.3d at 795. For a defendant to have sufficient contacts with the forum, it is essential that there be some act by which the defendant "purposefully avails" itself of the privilege of conducting activities in the forum state, thus invoking the benefits and protections of its laws. *Michiana Easy Livin' Country, Inc. v. Holten,* 168 S.W.3d 777, 784 (Tex. 2005). Although not determinative, foreseeability is an important consideration in deciding whether the nonresident defendant purposefully has established minimum contacts with Texas. *BMC Software*, 83 S.W.3d at 795. The concept of foreseeability is implicit in the requirement that there be a substantial connection between the defendants and Texas arising from their conduct purposefully directed toward Texas. *See Guardian Royal Exch. Assur., Ltd. v.*

---

[2] The Dresser-Rand Parties do not argue on appeal that the trial court could exercise personal jurisdiction over the Centauro Parties based upon general jurisdiction. In any event, the evidence before the trial court and unchallenged findings of fact show that the trial court could not exercise personal jurisdiction over the Centauro Parties based upon general jurisdiction. *See Daimler AG v. Bauman*, —U.S.—,—, 134 S. Ct. 746, 760–62, 187 L.Ed.2d 624 (2014).

*English China Clays, P.L.C.*, 815 S.W.2d 223, 227 (Tex. 1991). A defendant should not be subject to a Texas court's jurisdiction based upon random, fortuitous, or attenuated contacts. *BMC Software*, 83 S.W.3d at 795.

Specific jurisdiction exists when the claims in question arise from or relate to the defendant's purposeful contacts with Texas. *Am. Type Culture Collection Inc. v. Coleman*, 83 S.W.3d 801, 807 (Tex. 2002). In conducting a specific-jurisdiction analysis, we focus on the relationship among the defendants, Texas, and the litigation. *See Guardian Royal,* 815 S.W.2d at 228. For a nonresident defendant's contacts with Texas to support an exercise of specific jurisdiction, there must be a substantial connection between the defendant's purposeful contacts with Texas and the operative facts of the litigation. *See Moki Mac River Expeditions v. Drugg,* 221 S.W.3d 569, 585 (Tex. 2007).

## Specific-Jurisdiction Analysis

In conducting a personal-jurisdiction analysis, we review the claims in question and the evidence regarding the jurisdictional facts, but we do not adjudicate the merits of the claims. *See Lisitsa v. Flit*, 419 S.W.3d 672, 682 (Tex. App.—Houston [14th Dist.] 2013, pet. filed); *Weldon-Francke v. Fisher*, 237 S.W.3d 789, 792 (Tex. App.—Houston [14th Dist.] 2007, no pet.). Ultimate liability in tort is not a jurisdictional fact, and the merits of the Dresser-Rand Parties' claims are not at issue in determining whether the trial court erred in dismissing these claims for lack of personal jurisdiction.[3] *See Lisitsa*, 419 S.W.3d at 682; *Weldon-Francke*, 237 S.W.3d at 792.

---

[3] Therefore, the trial court's conclusion of law that the Dresser-Rand Parties did not plead a cognizable claim under Texas law does not provide a valid basis for concluding that the trial court could not exercise personal jurisdiction over the Centauro Parties based on specific jurisdiction or that the Dresser-Rand Parties' claims should be dismissed for lack of personal jurisdiction. *See Lisitsa*, 419 S.W.3d at 682; *Weldon-Francke*, 237 S.W.3d at 792.

In their live petition in the trial court, the Dresser-Rand Parties made the following allegations:

- The sale of the Grupo Guascor stock under the Agreement closed on May 4, 2011.

- The Dresser-Rand Parties performed under the Agreement and paid the Closing Consideration to each of the Sellers in proportion to its respective share of Grupo Guascor's capital. As the largest shareholder, Centauro Capital received consideration that included 3,245,737 shares of Dresser-Rand stock.

- The Dresser-Rand Parties and the Sellers are currently in a dispute regarding the amount of the Adjustment. The Dresser-Rand Parties claim that, as a result of the Adjustment, they are entitled to receive a payment of approximately €36 million.

- Pursuant to section 2.6(f) of the Agreement, Dresser-Rand Spain initiated a proceeding before the Independent Expert in Paris, France. The Sellers initiated an arbitration proceeding against the Dresser-Rand Parties before the International Chamber of Commerce in Paris, France.

- Until these proceedings are concluded and the parties' claims resolved, the final purchase price of the Grupo Guascor stock remains undetermined.

- At closing, €30 million of the Closing Consideration was placed in escrow to serve as partial security for the benefit of the Dresser-Rand Parties in respect of indemnification claims and the Adjustment. In addition to the dispute regarding the Adjustment, the Dresser-Rand Parties also have filed numerous indemnification claims against the Sellers under section 9.1 of the Agreement. The total amount of these indemnification claims is expected to be at least €30 million, thus exhausting the escrow amount and not leaving any escrow amount as security for the Adjustment.

- The Dresser-Rand Parties are extremely concerned that, if Grajales or Centauro Capital is permitted to exercise complete control over the Closing Consideration that already has been paid, Grajales will not make a sufficient portion of that disputed consideration available to satisfy his and the Sellers' obligations to the Dresser-Rand Parties. If Centauro Capital, the holder of approximately 3.2 million of the approximately 5 million shares of Dresser-Rand stock paid to the Sellers, is able to sell or

11

otherwise control or encumber its Dresser-Rand stock or the cash proceeds thereof, the Centauro Parties, by being able to spend, conceal, or otherwise dispose of and dissipate the Closing Consideration in their possession, will be able to scuttle the process set forth in the Agreement and render the ongoing proceedings in Paris (hereinafter the "Paris Proceedings") "fundamentally meaningless."

- The only way to maintain the integrity of the Paris Proceedings is to assure that the Centauro Parties do not dispose of the Closing Consideration that is the subject of those proceedings. Therefore, the Dresser-Rand Parties seek injunctive relief barring the Centauro Parties from selling Dresser-Rand stock totaling a value of €25,068,236.14, or if Centauro or Grajales already has sold or desires to sell such stock in the future, requiring the Centauro Parties to place the proceeds of any such sale into escrow until final decisions are rendered in the Paris Proceedings.

- Under a claim entitled "Preservation of Subject Matter of Pending Disputes," the Dresser-Rand Parties allege that the Centauro Parties are about to perform an act that directly affects the subject matter of the Paris Proceedings. The injunctive relief sought by the Dresser-Rand Parties allegedly is required to protect the rights granted to the Dresser-Rand Parties under the Agreement and to preserve the status quo of the subject matter of the Paris Proceedings until final decisions are made in those proceedings and the parties' disputes resolved in a meaningful way.

- Under the heading "Application for Temporary Injunction," the Dresser-Rand Parties assert they are entitled to a temporary injunction granting the relief they seek because the Dresser-Rand Parties allegedly have a probable right to the relief they seek in the Paris Proceedings and because, absent such injunctive relief, they will suffer probable, imminent, and irreparable injury. Centauro Capital allegedly has taken steps to dissipate all of the Dresser-Rand stock it received as part of its Closing Consideration under the Agreement. The Dresser-Rand Parties assert, upon information and belief, that the Centauro Parties will complete this process well before a final determination is made in either of the Paris Proceedings.

- Under the heading "Permanent Injunction," the Dresser-Rand Parties seek the same relief by means of a "permanent injunction" that they wish to be in effect until a final decision is rendered in both of the Paris

12

Proceedings.

We analyze minimum contacts for specific jurisdiction on a claim-by-claim basis, unless all claims are based on the same alleged forum contacts. *See Moncrief Oil Int'l, Inc.*, 414 S.W.3d at 151. In the case under review, the Dresser-Rand Parties' three claims are all based on the same purported contacts with Texas; therefore, we do not analyze minimum contacts for specific jurisdiction on a claim-by-claim basis. *See Lisitsa v. Flit*, 419 S.W.3d 672, 679 (Tex. App.—Houston [14th Dist.] 2013, pet. filed).

Although the Dresser-Rand Parties assert three claims, they seek the same injunctive relief under each and they allegedly seek to preserve the status quo pending resolution of both of the Paris Proceedings. Thus, the substance of each of the Dresser-Rand Parties' three claims is an application for a temporary injunction preserving the status quo pending resolution of the Paris Proceedings.[4]

For a Texas court to be able to exercise personal jurisdiction over a nonresident based on specific jurisdiction, there must be a substantial connection between the nonresident's purposeful contacts with Texas and the operative facts of the litigation. *See Moki Mac River Expeditions*, 221 S.W.3d at 585. Significantly, none of the claims that are pending in either of the Paris Proceedings have ever been pending in the case under review, nor has the trial court in this case compelled any party to proceed with the Paris Proceedings (or either of them). Thus, the operative facts of the claims pending in either of the Paris Proceedings are not the operative facts of the Texas litigation. *See id.* Instead, the operative

---

[4] The Centauro Parties assert that, under section 2.6 of the Agreement, the Adjustment is effected only by means of a payment by the Sellers or by Dresser-Rand and that the requested relief would amount to a pre-judgment attachment to which the Dresser-Rand Parties are not entitled. We do not adjudicate the merits of the Dresser-Rand Parties' claims, we only characterize the substance of these claims for the purpose of our personal-jurisdiction analysis.

facts of this litigation concern the steps allegedly taken by the Centauro Parties in the past to begin to "dissipate" all of the Dresser-Rand stock Centauro received as part of its Closing Consideration under the Agreement, as well as steps that may be taken in the future by the Centauro Parties to complete this alleged dissipation.[5] *See id.* (where the plaintiffs sued a river-rafting outfitter for intentional and negligent misrepresentations and wrongful death after their minor son's fatal fall while on a hike under the defendant's supervision, the operative facts of the suit were those concerning the guides' conduct of the expedition and whether they exercised reasonable care).

The evidence before the trial court for its special-appearance rulings does not show that any of these alleged steps or anticipated steps by either of the Centauro Parties occurred in Texas or would occur in Texas. Rather, the evidence shows that Grajales is a Spanish citizen living in Spain and that Centauro Capital is a Spanish company operating in Spain. The evidence also shows that Centauro Capital's Dresser-Rand shares are held by Merrill Lynch and that Centauro Capital, when communicating with Merrill Lynch regarding its Dresser-Rand shares, deals exclusively with personnel located in Merrill Lynch's Madrid offices On appeal, the Dresser-Rand Parties have not challenged the trial court's finding that Centauro Capital has never held or traded the Dresser-Rand shares or any other property through a United States bank or other entity. The special-appearance evidence shows that there is not a substantial connection between either of the Centauro Parties' alleged purposeful contacts with Texas and the operative facts of this litigation.[6] *See id.*; *Transportes de Zima Real S.A. de C.V. v. Lizarraga*, No.

---

[5] Whether the Dresser-Rand Parties have a probable right to relief on their claims in the Paris Proceedings involves a legal analysis of the probability that the Dresser-Rand Parties will recover on their claims regarding the Adjustment and their indemnification claims.

[6] A Spanish attorney currently serving as Centauro Capital's "Legal Director," testified that all of Centauro Capital's business is conducted from offices located in Spain and that, in

14-13-00933-CV, 2014 WL 3512858, at *2–3 (Tex. App.—Houston [14th Dist.] July 15, 2014, no pet.) (mem. op.); *Lamar v. Poncon*, 305 S.W.3d 130, 138 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

The Dresser-Rand Parties assert that specific jurisdiction can be based on the following alleged purposeful contacts of the Centauro Parties with Texas: (1) the Centauro Parties allegedly participated in prolonged and deliberate contract negotiations with Texas-based Dresser-Rand, including two visits by Centauro Capital representatives, including Grajales, to Houston; (2) the Centauro Parties allegedly requested and received due-diligence information directly from Dresser-Rand in Texas; and (3) the Centauro Parties allegedly provided due diligence and other information and materials to be reviewed by and discussed with Dresser-Rand in Texas. The Dresser-Rand Parties also argue that, as a result of alleged contacts with Texas, Centauro received more than 3.2 million shares of Texas-based Dresser-Rand Group stock, and Grajales was appointed and served as a compensated Advisory Director to Dresser-Rand's board of directors, participating in person and by telephone in multiple board meetings in Texas, and signing a confidentiality agreement governed by Texas law. Presuming, without deciding, that the Centauro Parties had the foregoing purposeful contacts with Texas, there still would be no substantial connection between either of the Centauro Parties' purposeful contacts with Texas and the operative facts of this litigation. *See Moki Mac River Expeditions*, 221 S.W.3d at 585; *Transportes de Zima Real S.A. de C.V.*, 2014 WL 3512858, at *2–3; *Lamar*, 305 S.W.3d at 138.

---

February 2013, he emailed Dresser-Rand's general counsel asking, among other things, what steps Centauro Capital should take if it wanted the restrictive legend on Centauro Capital's Dresser-Rand stock removed. After an exchange of emails between these two lawyers, Dresser-Rand issued instruction letters to the Massachusetts office of its transfer agent, asking that the restrictive legend be removed. Less than two weeks later, the Dresser-Rand Parties filed the Texas litigation.

In the absence of such a substantial connection, the trial court did not err in granting the Centauro Parties' special appearances.[7] *See Moki Mac River Expeditions*, 221 S.W.3d at 585; *Transportes de Zima Real S.A. de C.V.*, 2014 WL 3512858, at \*2–3; *Lamar*, 305 S.W.3d at 138. Accordingly, we overrule the Dresser-Rand Parties' third and sixth issues.[8]

## IV. CONCLUSION

The operative facts of this litigation concern the steps allegedly taken by the Centauro Parties in the past to begin to "dissipate" all of the Dresser-Rand stock Centauro received as part of its Closing Consideration under the Agreement, as well as steps that the Centauro Parties may take in the future to complete this alleged dissipation. The special-appearance evidence shows that there is not a substantial connection between either of the Centauro Parties' alleged purposeful contacts with Texas and the operative facts of this litigation. Absent such a

---

[7] The Dresser-Rand Parties cite various personal-jurisdiction cases in support of their assertion that the undisputed evidence shows that trial court may exercise personal jurisdiction over the Centauro Parties based on specific jurisdiction, but each of these cases involves facts materially different from those in the case under review.

[8] In their live pleading, the Dresser-Rand Parties assert that, under the ICC Rules of Arbitration parties to an ICC arbitration may apply to any competent judicial authority for "interim or conservatory measures," despite the party's arbitration agreement. Presuming that this is so, under the Agreement, in any action or proceeding between any of the parties arising out of or relating to the Agreement, to the extent the action or proceeding is not subject to the arbitration provision, the parties submit non-exclusively to the jurisdiction of (a) Madrid, Spain, if the action is commenced by Dresser-Rand or any of its affiliates, or (b) Houston, Texas, if the action is commenced by the Sellers or the Seller Representative. Because the Texas lawsuit was commenced by the Dresser-Rand Parties, the only possible consent to the jurisdiction that might apply under the Agreement is to the jurisdiction of Madrid, Spain. The parties could have made different arrangements regarding consent or submission to jurisdiction in court proceedings relating to the Agreement, but they did not do so. Because the Centauro Parties have not consented to jurisdiction in Texas as to the case under review or otherwise waived their personal-jurisdiction challenges, this court must determine whether the trial court erred in granting the Centauro Parties' special appearances and in concluding that the exercise of personal jurisdiction over the Centauro Parties would violate federal due-process guarantees.

substantial connection, the trial court did not err in granting the Centauro Parties' special appearances.[9]

/s/    Kem Thompson Frost
Chief Justice

Panel consists of Chief Justice Frost and Justices Boyce and Jamison.

---

[9] In their first issues, the Dresser-Rand Parties assert that the Centauro Parties are within the scope of the Texas long-arm statute. In their second, fourth, and eighth issues, the Dresser-Rand Parties challenge the legal and factual sufficiency of certain fact findings of the trial court. But, even if these findings were set aside, that ruling would not affect this court's analysis above. In their fifth issues, the Dresser-Rand Parties assert that the fiduciary-shield doctrine does not preclude the exercise of specific jurisdiction over Grajales. In their seventh issue, the Dresser-Rand Parties assert that the Centauro Parties did not show that the exercise of personal jurisdiction over them does not comport with traditional notions of fair play and substantial justice. Based on our analysis and disposition of the third and sixth issues, we need not and do not address these other issues.