**Affirmed and Opinion filed February 25, 2020.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-18-00133-CV

---

### AMEC FOSTER WHEELER PLC, Appellant

### V.

### ENTERPRISE PRODUCTS OPERATING LLC, Appellee

---

**On Appeal from the 151st District Court**
**Harris County, Texas**
**Trial Court Cause No. 2016-59155**

---

## O P I N I O N

In this interlocutory appeal, a company organized under the laws of England and Wales challenges the overruling of its special appearance based on specific jurisdiction and the plaintiff's alter-ego theory of personal jurisdiction. Concluding that the trial court did not err in overruling the special appearance based on specific jurisdiction, we affirm.

# I. FACTUAL AND PROCEDURAL BACKGROUND

Appellee/plaintiff Enterprise Products Operating LLC, a Texas limited liability company with its principal place of business in Texas, sued two defendants in the trial court below: (1) Foster Wheeler USA Corporation, a Delaware corporation now known as Amec Foster Wheeler USA Corporation, with its principal place of business in Texas ("Foster Wheeler"); and (2) Amec Foster Wheeler plc, a company organized under the laws of England and Wales, with its principal place of business in England ("Foster Wheeler PLC").

In July 2013, Enterprise and Foster Wheeler executed a contract for the engineering, procurement, and construction of a propane dehydrogenation facility in Mont Belvieu, Texas (the "Contract"). According to Enterprise's live pleading, the primary purpose of a propane dehydrogenation facility is to convert propane into propylene, which is an ingredient in plastic and various other products. The parties to the Contract agreed that the Contract would be governed by, and construed and enforced in accordance with, Texas law. The parties consented to the personal jurisdiction of any state or federal court located in Harris County, Texas, in any legal proceeding with respect to the Contract.

Enterprise alleges that from July 2013 through October 2014, Foster Wheeler failed to take many actions that it should have taken and failed to comply with the Contract in many respects. Enterprise claims that as it became evident that Foster Wheeler had no idea how much engineering work it had left to complete, in October 2014, Enterprise called for a complete engineering stand-down to assess the severity of Foster Wheeler's engineering issues. According to Enterprise, as a result of this stand-down assessment, it became obvious that Foster Wheeler had a significant volume of engineering work left to do, which was wholly inconsistent with the schedule and Foster Wheeler's staffing

projections. Enterprise alleges that around this time, Foster Wheeler knowingly and falsely misrepresented the project's schedule to Enterprise to avoid being terminated as contractor under the Contract.

On November 13, 2014, Foster Wheeler PLC, formerly known as Amec plc, indirectly acquired Foster Wheeler. As a result, the name of Foster Wheeler changed from "Foster Wheeler USA Corporation" to "Amec Foster Wheeler USA Corporation." Enterprise alleges that after this transaction, Foster Wheeler PLC took over control of the project and replaced many of Foster Wheeler's project managers and leaders with its own personnel. Enterprise claims that, through its words and actions, Foster Wheeler PLC "purposefully inserted itself in the contractual relationship between Enterprise and Foster Wheeler, stood in Foster Wheeler's shoes[,] . . . supplanted Foster Wheeler's management of daily operations, and assumed and ratified Foster Wheeler's obligations and benefits under the [Contract]." According to Enterprise, Simon Naylor, who served as Foster Wheeler PLC's "Group President, Americas," assumed ultimate control over the project almost immediately following the acquisition. Enterprise claims that Naylor (1) assigned legacy Amec personnel from around the world to travel to Texas and work on the project, (2) met face to face many times with Enterprise management, executives, and board members regarding the project at Enterprise's Houston, Texas headquarters; and (3) regularly reported back to Foster Wheeler PLC's Chief Executive Officer regarding the project's status and the efforts to turn the project around and satisfy Enterprise.

Enterprise asserts that Naylor, Jeff Reilly, and Peter Bailey were employees or agents of Foster Wheeler PLC. Enterprise alleges that Naylor, Reilly, and Bailey met with Enterprise management several times in Houston and that during these meetings the Enterprise representatives explained the dire state

3

of the project, Foster Wheeler's dismal performance to date, and the highly disturbing trajectory of the costs and schedule. Enterprise claims that it was prepared to terminate the Contract and replace Foster Wheeler with another contractor but for Foster Wheeler PLC stepping in, bringing in new legacy Amec personnel, and taking over the project. According to Enterprise, Foster Wheeler PLC's management agreed that Foster Wheeler's performance had been poor, and Foster Wheeler PLC stated that it took full ownership and responsibility for Foster Wheeler's failures. Enterprise alleges that Foster Wheeler PLC represented that it would work to address these concerns immediately, use its "global resources" to get the project back on track, and ensure that all future work on the project would be performed properly to Enterprise's satisfaction. Enterprise asserts that these representations were material to Enterprise, and effectively gained Foster Wheeler a "stay of execution" because Enterprise relied upon those representations in deciding not to terminate Foster Wheeler at that time. According to Enterprise, Naylor, Reilly, and Bailey, on behalf of Foster Wheeler PLC, controlled the project and its team thereafter and communicated directly with Enterprise management about the project's status.

Enterprise claims that despite the alleged promises and personnel changes, Foster Wheeler PLC did not rescue the failing project. Enterprise claims that failures continued, including negligent construction work, and that breaches of contractual duties, warranties, and common-law duties of care by Foster Wheeler PLC and Foster Wheeler directly caused enormous cost overruns and schedule delays on the project. Enterprise claims that by the fall of 2015, it had no choice but to hire a replacement general contractor. According to Enterprise, "[Foster Wheeler PLC]/Foster Wheeler" and Enterprise agreed to the "Transition Services Agreement, under which the parties agreed to a partial termination of the

4

Contract and the selection of Optimized Process Designs, LLC to take over the remaining construction work while "[Foster Wheeler PLC]/Foster Wheeler" remained responsible for the remaining engineering work. Enterprise asserts that as Optimized Process took over the construction, Enterprise and Optimized Process discovered many additional, significant problems with Foster Wheeler's and Foster Wheeler PLC's work.

In September 2016, Enterprise terminated the Contract for cause and filed this lawsuit against Foster Wheeler and Foster Wheeler PLC (collectively the "Foster Wheeler Parties"). Enterprise alleges that Foster Wheeler PLC is jointly and severally liable for Foster Wheeler's wrongful conduct. Enterprise asserts a fraudulent-inducement claim against Foster Wheeler only and claims against both of the Foster Wheeler Parties for (1) breach of contract, (2) breach of warranty, (3) "string-along fraud," (4) professional negligence, (5) unjust enrichment, and (6) money had and received. Enterprise also seeks to recover exemplary damages based on the alleged gross negligence of each of the Foster Wheeler Parties. Enterprise also asserts against Foster Wheeler PLC claims for negligent misrepresentation and purported claims for equitable estoppel and direct-benefits estoppel. In addition to seeking substantial money damages, Enterprise seeks the remedies of equitable disgorgement and fee forfeiture.

Foster Wheeler PLC filed a special appearance challenging the trial court's ability to exercise personal jurisdiction over Foster Wheeler PLC. Foster Wheeler PLC asserts that it is a holding company organized under the laws of England and Wales with its principal place of business in England. Foster Wheeler PLC states that virtually all of its employees live and work in the United Kingdom. Foster Wheeler PLC submitted evidence that, as of October 31, 2016, it owned the controlling interest in 439 subsidiaries and affiliates that operated in

more than 55 countries in virtually every region of the world. According to Foster Wheeler PLC and an affidavit it submitted, Foster Wheeler PLC derives all of its revenue from the return on its investments in its subsidiaries and affiliates, and Foster Wheeler PLC does not directly engage in the business conducted by its subsidiaries and affiliates. According to Foster Wheeler PLC, its subsidiaries and affiliates conduct all operations. And, the subsidiaries and affiliates or their employees in the countries where they are authorized to operate hold the licenses to engage in these operations. Foster Wheeler PLC claims that all employees who engage in the operations of the subsidiaries and affiliates do so on behalf of the subsidiaries and affiliates and not on behalf of Foster Wheeler PLC. Foster Wheeler PLC asserted that Naylor, Reilly, and Bailey are employees of Amec E&C Services, Inc., a Georgia corporation with its principal place of business in Georgia ("Amec E&C") and not employees of Foster Wheeler PLC. According to Foster Wheeler PLC, no representative of Foster Wheeler PLC was present at any of the meetings on which Enterprise bases its claims. Foster Wheeler PLC submitted a substantial amount of evidence and challenged the trial court's ability to exercise personal jurisdiction over Foster Wheeler PLC based on specific jurisdiction, general jurisdiction, or on Foster Wheeler PLC's alleged status as an alter ego of Foster Wheeler.[1]

Enterprise opposed the special appearance and submitted evidence. Enterprise made various statements and assertions, including an argument that Naylor, Reilly, and Bailey acted as employees and agents of Foster Wheeler PLC. Enterprise asserted that the trial court properly could exercise personal jurisdiction over Foster Wheeler PLC based on specific jurisdiction, general jurisdiction, or on Foster Wheeler PLC's alleged status as an alter ego of Foster

---

[1] Foster Wheeler PLC made various other statements and assertions not described here.

Wheeler.

The trial court overruled Foster Wheeler PLC's special appearance based on both specific jurisdiction and the alter ego theory. The trial court determined that it could not exercise personal jurisdiction over Foster Wheeler PLC based on general jurisdiction. The trial court issued findings of fact and conclusions of law. Foster Wheeler PLC timely perfected this interlocutory appeal from the trial court's special-appearance order.

## II. ISSUES AND ANALYSIS

In four appellate issues, Foster Wheeler PLC asserts that (1) the trial court erred in holding that it may exercise personal jurisdiction over Foster Wheeler PLC based on specific jurisdiction; (2) the trial court erred in finding that Foster Wheeler and Foster Wheeler PLC are alter egos for jurisdictional purposes; (3) the trial court erred in finding that Foster Wheeler PLC has a "significant presence in Texas" and "numerous and substantial contacts with Texas"; and (4) the exercise of personal jurisdiction over Foster Wheeler PLC in this case would not comport with traditional notions of fair play and substantial justice.

## A. Did the trial court err in determining that it could exercise personal jurisdiction over Foster Wheeler PLC based on specific jurisdiction?

In its first issue, Foster Wheeler PLC challenges the trial court's determination that it may exercise personal jurisdiction over Foster Wheeler PLC based on specific jurisdiction. Foster Wheeler PLC challenges several of the trial court's findings. We begin the analysis by examining the standard of review and personal-jurisdiction legal standards and then we consider whether the evidence before the trial court supported certain findings.

7

### 1. *Standard of Review*

Whether Foster Wheeler PLC is subject to personal jurisdiction in Texas is a question of law subject to de novo review. *See BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). But, the trial court frequently must resolve questions of fact before deciding the jurisdiction question. *See id.* When, as in today's case, the trial court rules on a special appearance and issues findings of fact and conclusions of law, the appellant may challenge the legal and factual sufficiency of the evidence supporting the fact findings. *See id.*

Foster Wheeler PLC has challenged the legal and factual sufficiency of the evidence supporting several trial court findings. When reviewing the legal sufficiency of the evidence, we consider the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005). We must credit favorable evidence if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *See id.* at 827. We must determine whether the evidence at trial would enable reasonable and fair-minded people to find the facts at issue. *See id.* The factfinder is the only judge of witness credibility and the weight to give to testimony. *See id.* at 819.

When reviewing a challenge to the factual sufficiency of the evidence, we examine the entire record, considering both the evidence in favor of, and contrary to, the challenged finding. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex. 1998). After considering and weighing all the evidence, we set aside the fact finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Id.* The trier of fact is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *GTE Mobilnet of S. Tex. v. Pascouet*, 61 S.W.3d 599, 615–16 (Tex. App.—

Houston [14th Dist.] 2001, pet. denied). We may not substitute our own judgment for that of the trier of fact, even if we would reach a different answer on the evidence. *Maritime Overseas Corp.*, 971 S.W.2d at 407. The amount of evidence necessary to affirm a judgment is far less than that necessary to reverse a judgment. *Pascouet*, 61 S.W.3d at 616.

## 2. *Legal Standards as to the Exercise of Personal Jurisdiction*

The Texas long-arm statute allows a court to exercise personal jurisdiction as far as the federal constitutional requirements of due process will permit. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 17.041–.045 (West, Westlaw through 2019 R.S.); *BMC Software*, 83 S.W.3d at 795. The plaintiff bears the initial burden of pleading allegations sufficient to confer jurisdiction under the Texas long-arm statute. *See Moncrief Oil Int'l, Inc. v. OAO Gazprom*, 414 S.W.3d 142, 149 (Tex. 2013). The long-arm statute allows the exercise of personal jurisdiction over a nonresident defendant who "contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state" or who "commits a tort in whole or in part in [Texas]." Tex. Civ. Prac. & Rem. Code § 17.042(1),(2) (West, Westlaw through 2019 R.S.). Because Enterprise satisfied its initial burden, the burden shifted to Foster Wheeler PLC to negate all potential bases for personal jurisdiction Enterprise alleged. *See Moncrief Oil Int'l, Inc.*, 414 S.W.3d at 149.

Personal jurisdiction over a nonresident defendant is constitutional when two conditions are met: (1) the defendant has established minimum contacts with the forum state and (2) the exercise of personal jurisdiction comports with traditional notions of fair play and substantial justice. *See BMC Software*, 83

9

S.W.3d at 795. For a defendant to have sufficient contacts with the forum, it is essential that there be some act by which the defendant "purposefully avails" itself of the privilege of conducting activities in the forum state, thus invoking the benefits and protections of its laws. *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 784 (Tex. 2005). In analyzing personal jurisdiction, only the defendant's purposeful contacts with the forum count; personal jurisdiction over a defendant cannot be based on the unilateral activity of another party. *Id.* at 785. A defendant should not be subject to a Texas court's jurisdiction based on random, fortuitous, or attenuated contacts. *Id.* For there to be purposeful availment, a defendant must seek some benefit, advantage, or profit by "availing" itself of the jurisdiction. *Id.*

Although not determinative, foreseeability is an important consideration in deciding whether the nonresident defendant purposefully has established minimum contacts with Texas. *BMC Software*, 83 S.W.3d at 795. The concept of foreseeability is implicit in the requirement that there be a substantial connection between the defendant and Texas arising from the defendant's conduct purposefully directed toward Texas. *See Guardian Royal Exch. Assur., Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 227 (Tex. 1991).

Specific jurisdiction exists when the claims in question arise from or relate to the defendant's purposeful contacts with Texas. *Am. Type Culture Collection Inc. v. Coleman*, 83 S.W.3d 801, 807 (Tex. 2002). In conducting a specific-jurisdiction analysis, we focus on the relationship among the defendant, Texas, and the litigation. *See Guardian Royal*, 815 S.W.2d at 228. For a nonresident defendant's contacts with Texas to support an exercise of specific jurisdiction, there must be a substantial connection between the defendant's purposeful contacts with Texas and the operative facts of the litigation. *See Moki Mac River*

10

*Expeditions v. Drugg*, 221 S.W.3d 569, 585 (Tex. 2007).

### 3. Fact Findings as to Specific Jurisdiction

The trial court made the following findings relating to specific jurisdiction:

5. [Foster Wheeler PLC's] employees, agents, and/or apparent agents—including Simon Naylor *(Group President of [Foster Wheeler PLC's] Americas Business Unit)*, Jeff Reilly *([Foster Wheeler PLC's] Group President of Strategy and Business Development)*, and Peter Bailey *([Foster Wheeler PLC's] Senior Vice President of Project Delivery for the Americas Business Unit*, and one of Naylor's direct reports*)*—were physically present in Texas for substantial periods of time during which they directed and managed the [project].[2]

6. [Foster Wheeler PLC], through its employees, agents, and/or apparent agents, among other things:

    a. Attended numerous meetings at Enterprise's Houston headquarters about the [project], visited the [project] site in Mont Belvieu, and exchanged numerous emails and letters with Enterprise in Texas about the [project].

    b. Directed, controlled, and managed the [project] in Texas.

    c. Made representations to Enterprise in Texas that gave rise to Enterprise's fraud, negligent misrepresentation, and estoppel claims against [Foster Wheeler PLC].

    d. Performed and/or was responsible for acts and omissions in Texas, regarding the [project] in Texas, which gave rise to Enterprise's gross and professional [sic] negligence and unjust enrichment claims against [Foster Wheeler PLC].

    e. Made representations and/or promises, and performed acts and/or omissions, in Texas that gave rise to Enterprise's assumption and breach of contract claims against [Foster Wheeler PLC].

### 4. Sufficiency of the Evidence that Naylor was an employee of Foster Wheeler PLC

Foster Wheeler PLC agrees that Naylor maintained his office in Houston,

---

[2] Italics in original.

Texas, during the relevant time period. However, Foster Wheeler PLC asserts that Naylor was an employee of Amec E&C who acted on behalf of Foster Wheeler—not Foster Wheeler PLC—when he engaged in the conduct upon which Enterprise relies in asserting its claims.

The record contains a letter that served as Naylor's employment agreement at the time Naylor engaged in the conduct on which Enterprise bases its claims (the "Relevant Time"). Naylor testified that Will Serle was the Group Human Resources Director of Foster Wheeler PLC and that Serle sent the letter from London to Naylor in Houston, Texas, using Foster Wheeler PLC letterhead. In this correspondence, Serle says that the letter sets out the terms and conditions applicable to Naylor's new role as "Group President, Americas," in which Naylor will report to Chief Executive Officer Samir Brikho. Brikho was Chief Executive Officer of Foster Wheeler PLC. In the letter, Serle states that in his position he also will be serving as a member of Foster Wheeler PLC's "Group Management Committee" and that Naylor "will work out of the Houston office." Serle stated that "[t]his document will serve as an Employment Agreement between you, [Amec E&C][,] AMEC Global Resources[,] and the parent company [Foster Wheeler PLC], collectively 'AMEC.'" In the letter Serle discusses the terms of Naylor's "employment with AMEC," refers to Naylor's employer as "AMEC," and refers to Naylor as an "employee of AMEC," a defined term that includes Foster Wheeler PLC and two other entities, but does not include Foster Wheeler. According to the letter, "AMEC," which includes Foster Wheeler PLC, may terminate Naylor's employment for cause if Naylor disobeys "lawful orders or directives of the [Foster Wheeler PLC] Board or the CEO." In the letter Serle states that the internal laws of the state in the United States in which Naylor resides will govern the validity, interpretation,

12

construction, and performance of the employment agreement. The record reflects that Naylor was residing in Texas, so Texas law governed Naylor's employment by the three entities, including Foster Wheeler PLC, while Naylor was working out of an office in Houston, Texas. Naylor signed the letter agreement and returned it to Serle.

The record also contains a document in which the Chief Executive Officer of Foster Wheeler PLC delegated authority to the Group Presidents, which would include Naylor as Group President of the Americas. In this document, Foster Wheeler PLC's Chief Executive Officer stated that the Group Presidents "are mandated by the [Chief Executive] to direct and manage the day-to-day business operations of [Foster Wheeler PLC] within the respective geographical regions of the world specifically assigned to them by the Chief Executive in accordance with / as clarified below." Texas fell within the region of the Americas assigned to Naylor as Group President of the Americas. Under the document, the Group Presidents have authority to enter into certain types of contracts and to take other actions.

Naylor testified at his deposition, giving details about his encounters with Enterprise, including the following: (1) Naylor's business card said he was "Group President of the Americas" and showed that his office was in Houston, Texas; (2) Naylor believed that he introduced himself to Richard Hutchison, a representative of Enterprise, as "the Group President of the Americas business unit"; (3) Naylor introduced himself to senior Enterprise personnel as "the Group President of the Americas"; (4) Naylor did not recall whether from January 2015 through May 2016, there was an individual serving as Chief Executive Officer of Amec Foster Wheeler USA Corporation; and (5) Naylor did not know who owned the office in Houston at which he was working during the Relevant Time.

13

The record also contains the employment agreement for John Pearson, the person who took over as Group President of the Americas after Naylor left that position. Under Pearson's employment agreement, Pearson's only employer is Foster Wheeler PLC.

Naylor submitted an affidavit in which he stated that during the Relevant Time he was employed by Amec E&C and that he has never been an officer or director of Foster Wheeler PLC. The evidence contains W-2 forms issued by Amec E&C showing that Naylor is an employee of Amec E&C. Naylor stated that when he was Group President of the Americas he maintained his office at the headquarters of Foster Wheeler in Houston. According to Naylor, he has "never intentionally represented to anyone that [he] was acting on behalf of, or with the authority from, [Foster Wheeler PLC]."

Under Naylor's employment agreement, Naylor was an employee of three companies, one of which was Foster Wheeler PLC. Under the delegated-authority document, the Chief Executive Officer of Foster Wheeler PLC delegated authority to Naylor as Group President of the Americas, and mandated that Naylor direct and manage the day-to-day business operations of Foster Wheeler PLC within the Americas in accordance with the delegated-authority document. The record also contains evidence showing that the person who succeeded Naylor as Group President of the Americas served as an employee only of Foster Wheeler PLC. Despite the conflicting evidence, under the applicable standard or review, we conclude that the evidence is legally and factually sufficient to support a finding that Naylor was acting as an employee of Foster Wheeler PLC. *See Huynh v. Nguyen*, 180 S.W.3d 608, 620 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Thus, the evidence is legally and factually sufficient to support the trial court's finding that Naylor was an employee, agent,

and/or apparent agent of Foster Wheeler PLC.

### 5. *Sufficiency of the Evidence that Reilly was an employee of Foster Wheeler PLC*

Foster Wheeler PLC agrees that Reilly maintained his office in Houston, Texas, during the Relevant Time. But, Foster Wheeler PLC asserts that Reilly was an employee of Amec E&C who acted on behalf of Foster Wheeler—not Foster Wheeler PLC—when he engaged in the conduct upon which Enterprise relies in asserting its claims.

The record contains a letter that served as Reilly's employment agreement during the Relevant Time. Will Serle sent that letter to Reilly in Houston, Texas. Evidence in the record shows that Serle was the Group Human Resources Director of Foster Wheeler PLC. Serle sent the letter using Foster Wheeler PLC letterhead. In the letter Serle confirms an offer of employment for Reilly to serve as "Group President, Business Development," in which Reilly will report to Chief Executive Officer Samir Brikho. Brikho was Chief Executive Officer of Foster Wheeler PLC. In the letter, Serle states that in this position Reilly also will serve as a member of Foster Wheeler PLC's "Management Team" and that Reilly "will work out of the Houston office." Serle stated that "[t]his document will serve as an Employment Agreement between you, [Amec E&C][,] and the parent company [Foster Wheeler PLC], collectively 'AMEC.'" In the letter Serle discusses the terms of Reilly's "employment with AMEC," refers to Reilly's employer as "AMEC," and refers to Reilly as an "employee of AMEC," a defined term that includes Foster Wheeler PLC and Amec E&C, but does not include Foster Wheeler. According to the letter, "AMEC," which includes Foster Wheeler PLC, may terminate Reilly's employment for cause if Reilly disobeys "lawful orders or directives of the [Foster Wheeler PLC] Board or the CEO." In the letter Serle states that the internal laws of the state of Reilly's residence will

15

govern the validity, interpretation, construction, and performance of the employment agreement. The record reflects that Reilly was residing in Texas, so Texas law would govern Reilly's employment by Foster Wheeler PLC and Amec E&C while Reilly was working out of an office in Houston, Texas. Reilly signed the letter agreement and returned it to Serle.

The record also contains a document in which the Chief Executive Officer of Foster Wheeler PLC delegates authority to the Group Presidents. Reilly served as "Group President, Business Development." In delegating authority, Foster Wheeler PLC's Chief Executive Officer states that the Group Presidents "are mandated by the [Chief Executive] to direct and manage the day-to-day business operations of [Foster Wheeler PLC] within the respective geographical regions of the world specifically assigned to them by the Chief Executive in accordance with / as clarified below." Under the document, the Group Presidents have authority to enter into certain types of contracts and to take other actions.

Reilly testified at his deposition that during his meetings or other conversations with Enterprise personnel, he never represented to anyone that he was an employee of Amec E&C and that he never would have said that he was employed by Foster Wheeler. Reilly testified that he never reported to anyone at Foster Wheeler.

Reilly submitted an affidavit in which he stated that during the Relevant Time he was employed by Amec E&C and that he has never been an officer or director of Foster Wheeler PLC. The evidence contains W-2 forms issued by Amec E&C showing that Reilly is an employee of Amec E&C. Reilly also stated that (1) he is "Group President, Strategy and Business Development" and a member of the Group Leadership Team that coordinates the management of the operational subsidiaries and affiliates owned by Foster Wheeler PLC; (2) during

16

the Relevant Time he established his office at the headquarters of Foster Wheeler in Houston; (3) he has "never intentionally represented to anyone that [he] was acting on behalf of, or with the authority from, [Foster Wheeler PLC]"; (4) when he met with representatives of Enterprise he was not acting as a representative of Foster Wheeler PLC; and (5) no officer, director, or other representative of Foster Wheeler PLC ever attended the meetings with the Enterprise representatives.

Under Reilly's employment agreement, Reilly is an employee of two companies, one of which is Foster Wheeler PLC. Under the delegated-authority document, Foster Wheeler PLC's Chief Executive Officer delegated authority to Reilly as Group President of Strategy and Business Development,[3] and mandated that he direct and manage the day-to-day business operations of Foster Wheeler PLC within the respective geographical regions of the world specifically assigned to him in accordance with the delegated-authority document. Though the record contains conflicting evidence, under the applicable standard or review, we conclude that the evidence is legally and factually sufficient to support a finding that Reilly was acting as an employee of Foster Wheeler PLC. *See Huynh*, 180 S.W.3d at 620. Thus, the evidence is legally and factually sufficient to support the trial court's finding that Reilly was an employee, agent, and/or apparent agent of Foster Wheeler PLC.

### 6. *Specific Jurisdiction*

In conducting a personal-jurisdiction analysis, we review the claims in question and the evidence regarding the jurisdictional facts, but we do not determine the merits of the claims. *See TV Azteca, S.A.B. De C.V. v. Ruiz*, 490 S.W.3d 29, 35 n.1 (Tex. 2016); *Dresser-Rand Group v. Centauro Capital,*

---

[3] In some places in the record, Reilly is referred to as "Group President, Business Development."

*S.L.U.*, 448 S.W.3d 577, 584 (Tex. App.—Houston [14th Dist.] 2014, no pet.). Ultimate liability in tort is not a jurisdictional fact, and the merits of Enterprise's claims are not at issue in determining whether the trial court erred in ruling on Foster Wheeler PLC's special appearance. *See id.* Thus, though we describe the substance of Enterprise's claims for the purposes of our personal-jurisdiction analysis, we do not adjudicate these claims or weigh their merit. *See id.* at 586, n.4.

Without commenting on the merits of Enterprise's claims, we note that Enterprise bases its claims for breach of contract, breach of warranty, negligence, equitable estoppel, direct-benefits estoppel, unjust enrichment, and money had and received on the alleged words and actions of Naylor, Reilly, and others in Texas after November 13, 2014. Enterprise alleges that through these words and actions, Foster Wheeler PLC assumed and ratified Foster Wheeler's obligations and benefits under the Contract. Likewise, without commenting on the merits of Enterprise's claims, we note that Enterprise bases its claims for "string-along fraud" and negligent misrepresentation on the alleged words of Naylor, Reilly, and others in Texas after November 13, 2014.

In resolving the personal-jurisdiction issues in this appeal, we are not to determine the validity of Enterprise's various allegations as to the merits. *See id.* Instead, we are to focus on the relationship among Foster Wheeler PLC, Texas, and the litigation and determine whether a substantial connection exists between Foster Wheeler PLC's purposeful contacts with Texas and the operative facts of the litigation. *See Moki Mac River Expeditions*, 221 S.W.3d at 585; *Guardian Royal*, 815 S.W.2d at 228. Regardless of the merits, Enterprise's claims arise from, relate to, and have a substantial connection with the words and actions of Naylor and Reilly in Texas during the Relevant Time. Because the evidence is

legally and factually sufficient to support the trial court's finding that Naylor and Reilly were acting as employees of Foster Wheeler PLC, Naylor's and Reilly's Texas contacts are attributable to Foster Wheeler PLC. *See Huynh*, 180 S.W.3d at 620. We conclude that the trial court did not err in overruling Foster Wheeler PLC's special appearance based on specific jurisdiction. *See id.*

To reach this conclusion, we need not and do not address whether the evidence is legally or factually sufficient to support (1) a finding that Naylor or Reilly directed and managed the project, (2) the trial court's finding that Foster Wheeler PLC, through its employees, agents, and/or apparent agents, directed, controlled, and managed the project in Texas, (3) a finding that Foster Wheeler PLC, through its employees, agents, and/or apparent agents, was responsible for acts and omissions in Texas regarding the project in Texas that gave rise to Enterprise's negligence and unjust-enrichment claims, (4) a finding that Bailey was an employee of Foster Wheeler PLC, (5) a finding that Naylor, Reilly, or Bailey was an agent of Foster Wheeler PLC, (6) a finding that Naylor, Reilly, or Bailey had actual or apparent authority, and (7) any of the trial court's findings regarding Enterprise's allegation that Foster Wheeler is an alter ego of Foster Wheeler PLC. *See Huynh*, 180 S.W.3d at 620, n.5.

In its first issue, Foster Wheeler PLC asserts that the evidence is legally and factually sufficient to support the trial court's finding that Foster Wheeler PLC "supplanted [Foster Wheeler] on the Contract and [the project] and took over total control of, and responsibility for, the [project] in Texas." We need not and do not address this finding, in which the trial court addressed the merits of Enterprise's claims. *See Dresser-Rand Group*, 448 S.W.3d at 584.

In its third issue, Foster Wheeler PLC asserts that the trial court erred in finding that Foster Wheeler PLC has a "significant presence in Texas" and

19

"numerous and substantial contacts with Texas." We need not and do not address this issue. *See Huynh*, 180 S.W.3d at 620, n.5.

We overrule the first issue and we need not address the second issue or the third issue.

### 7. *Traditional Notions of Fair Play and Substantial Justice*

In its fourth issue, Foster Wheeler PLC asserts that the exercise of personal jurisdiction over Foster Wheeler PLC would not comport with traditional notions of fair play and substantial justice. After a court finds the minimum contacts necessary to exercise personal jurisdiction over a nonresident defendant, federal due process requires the court to determine whether the exercise of that jurisdiction comports with traditional notions of fair play and substantial justice. *See Guardian Royal Exch. Assur., Ltd.*, 815 S.W.2d at 228. In deciding this issue, we consider the following factors: (1) the burden on the defendant, (2) the interests of the forum state in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental substantive social policies. *Id.* When the defendant is a resident of another nation, we also must consider (a) the unique burdens placed on the defendant who must defend itself in a foreign legal system, (b) the procedural and substantive policies of other nations whose interests are affected by the assertion of jurisdiction by a state court, and (c) the federal government's interest in its foreign-relations policies. *Id.* at 229. Only in rare cases will the exercise of personal jurisdiction not comport with fair play and substantial justice when the nonresident defendant purposefully has established minimum contacts with the forum state. *Id.* at 231.

20

Foster Wheeler PLC must present a compelling case that the presence of some other considerations would render the exercise of personal jurisdiction unreasonable. *See id.*

As to the burden of litigating this case in Harris County, Texas, Foster Wheeler PLC, a company organized under the laws of England and Wales, does not argue on appeal that this burden is unreasonable, nor does Foster Wheeler PLC cite evidence in the record as to the magnitude of this burden. Indeed, Foster Wheeler PLC's briefing as to traditional notions of fair play and substantial justice contains no citations to the record. Though litigating in Texas imposes a burden on Foster Wheeler PLC, evidence in the record shows that, as of October 31, 2016, Foster Wheeler PLC owned the controlling interest in 439 subsidiaries and affiliates that operated in more than 55 countries in virtually every region of the world. Modern transportation and communication have made it much less burdensome for a party to defend itself in a country in which it engages in economic activity. *Spir Star AG v. Kimich*, 310 S.W.3d 868, 879 (Tex. 2010). The burden on Foster Wheeler PLC of litigating in Texas is not so severe as to defeat the ability of Texas courts to exercise personal jurisdiction over Foster Wheeler PLC in this case. *See Moncrief Oil Int'l, Inc. v. OAO Gazprom*, 414 S.W.3d 142, 149 (Tex. 2013).

Foster Wheeler PLC asserts that Texas has no interest in adjudicating Enterprise's dispute with Foster Wheeler PLC because Foster Wheeler PLC is a foreign holding company without assets, offices, representatives, or agents in Texas. But, Will Serle, the Group Human Resources Director of Foster Wheeler PLC, signed off on letter agreements with Naylor and Reilly. In each employment agreement, (1) Foster Wheeler PLC was an employer, (2) the parties agreed that the employee "will work out of the Houston office"; (3) the

employment may be terminated for cause if the employee disobeys "lawful orders or directives of the [Foster Wheeler PLC] Board or the CEO"; and (4) the parties agreed that Texas law (the law of the state in which the employee resided) would govern the validity, interpretation, construction, and performance of the employment agreement. As discussed above, the evidence stands legally and factually sufficient to support findings that Naylor and Reilly were acting as employees of Foster Wheeler PLC. Though we do not address the merits of Enterprise's claims against Foster Wheeler PLC, Enterprise's live pleading shows that Enterprise asserts various claims against Foster Wheeler PLC and in support of those claims alleges substantial damages to Enterprise, a Texas entity, relating to a project for the construction of a propane dehydrogenation facility in Mont Belvieu, Texas. *See TV Azteca, S.A.B. De C.V.*, 490 S.W.3d at 35 n.1; *Dresser-Rand Group*, 448 S.W.3d at 584. Texas holds a significant interest in adjudicating the dispute between Enterprise and Foster Wheeler PLC. *See Moncrief Oil Int'l, Inc.*, 414 S.W.3d at 155.

Foster Wheeler PLC cites the United States Supreme Court's discussion of how an expansive view of general jurisdiction would not accord with fair play and substantial justice vis-à-vis defendants from other countries. *See Daimler AG v. Bauman*, 571 U.S. 117, 140 (2014). That discussion is not on point because it involved general jurisdiction rather than specific jurisdiction, and, more importantly, the *Daimler AG* case involved claims "having nothing to do with anything that occurred or had its principal impact in [the forum state]." *Id*. at 139. Foster Wheeler PLC cites only two cases in which a court found that the exercise of personal jurisdiction over the defendant would not comport with traditional notions of fair play and substantial justice despite the existence, or presumed existence, of sufficient minimum contacts with the forum state. *See*

22

*Guardian Royal Exch. Assur., Ltd.*, 815 S.W.2d at 232–33; *Juarez v. United Parcel Service de Mexico S.A. de C.V.*, 933 S.W.2d 281, 285–86 (Tex. App.— Corpus Christi 1996, no writ). In each case the interest of Texas in adjudicating the dispute and each defendant's contacts with Texas were significantly less than in today's case. *See Guardian Royal Exch. Assur., Ltd.*, 815 S.W.2d at 232–33; *Juarez*, 933 S.W.2d at 285–86. These cases are not on point.

Foster Wheeler PLC asserts that Foster Wheeler is the only defendant that was a party to the Contract and that Foster Wheeler is in this case to defend the claims against Foster Wheeler. Foster Wheeler PLC claims that requiring it to "defend the contractual obligations of a Texas subsidiary" would imply that Foster Wheeler PLC "should expect to be dragged into any of the forums in which its approximately 439 subsidiaries operate—an extremely unreasonable burden." These arguments implicitly ask us to adjudicate the merits of Enterprise's claims, a task we are not to undertake in determining personal jurisdiction. *See TV Azteca, S.A.B. De C.V.*, 490 S.W.3d at 35 n.1; *Dresser-Rand Group*, 448 S.W.3d at 584. In addition, courts assess personal jurisdiction on a case-by-case basis, so the ability of Texas courts to exercise personal jurisdiction over Foster Wheeler PLC in today's case does not mandate the conclusion that courts in other cases will be able to exercise personal jurisdiction over Foster Wheeler PLC. *See Grupo TMM, S.A.B. v. Perez*, 327 S.W.3d 357, 365–66 (Tex. App.—Houston [14th Dist.] 2010, pet. denied).

After carefully considering the record and all of the factors in the legal standard, we conclude that Foster Wheeler PLC has not made a compelling case that the exercise of personal jurisdiction over Foster Wheeler PLC in this dispute would be unreasonable. Therefore, we overrule the fourth issue.

### III. CONCLUSION

Under the applicable standard or review, the evidence is legally and factually sufficient to support a finding that Naylor and Reilly were acting as employees of Foster Wheeler PLC. Thus, the evidence is legally and factually sufficient to support the trial court's finding that each of them was an employee, agent, and/or apparent agent of Foster Wheeler PLC. Regardless of the merits, Enterprise's claims arise from, relate to, and have a substantial connection with the words and actions of Naylor and Reilly in Texas during the Relevant Time. The trial court did not err in overruling Foster Wheeler PLC's special appearance based on specific jurisdiction. The exercise of personal jurisdiction over Foster Wheeler PLC in this case comports with traditional notions of fair play and substantial justice.

We affirm the trial court's order on Foster Wheeler PLC's amended special appearance.


/s/    Kem Thompson Frost
          Chief Justice

Panel consists of Chief Justice Frost and Justices Zimmerer and Hassan.